Littleton, Judge,
delivered the opinion of the court:
Plaintiff, a Massachusetts corporation engaged in warehousing, manufacturing, general real estate management and other activities, sues to recover damages for the alleged wrongful termination by the Navy Department of a lease under which plaintiff leased certain premises from the Navy Department at Hingham, Massachusetts.
Pursuant to court order, the only issue tried and now before the court for determination relates to the right of the plaintiff to recover. Rule 38 (c).
The plaintiff and defendant executed an Agreement of Lease effective April 3, 1950, for a term of five years, under which the Government leased to the plaintiff the greater part of the Naval Industrial Reserve Shipyard at Hingham, *764 Massachusetts. Article 12 of the lease provided, in pertinent part, as follows:
Article 12. Termination. This lease may be terminated by the Department [of the Navy] at any time prior to the expiration of the term hereof:
(a) During any national emergency declared by the President or Congress;
* * * In the event of termination, the Department may at its election relet the whole or any portion of the Facilities for any period equal to, greater than, or less than the remainder of the term of this lease to any person, for any sum and upon any terms deemed by the Department to be reasonable and satisfactory. [Emphasis supplied.]
On December 16, 1950, the President of the United States declared the existence of a national emergency. In 1953, it was learned that considerable Government-owned property at the shipyard had been removed and apparently sold. On October 29, 1953, while the national emergency was still in existence, the Department of the Navy, having determined that the mobilization potential of the shipyard had been seriously impaired by the losses that had occurred, terminated the lease pursuant to Article 12 (a) above in order to prevent further loss of Government property. The shipyard was then leased to other private industrial users on terms substantially similar to those contained in plaintiff’s lease. Subsequently, plaintiff’s president and two of its employees were indicted, convicted and sentenced to prison for theft and embezzlement of Government property at the shipyard.
As is apparent from Article 12 of the Agreement of Lease, the Department of the Navy retained an absolute and unconditional right to terminate the lease during any period of national emergency as well as the right to relet the shipyard, upon such termination, to whomever it pleased. The sole contingency to the exercise of these rights was the declaration of such an emergency. That contingency had occurred when the Department terminated the lease in the present case.
*765 Generally speaking, where the parties to a lease agree that one party is to have an unconditional right to terminate the lease upon the happening of a specified event, and that event occurs, the courts will uphold the exercise of the right of termination regardless of the motive of the terminating party and regardless of the reasons for, or the fairness of the termination. Hightower v. United States, 80 C. Cls. 712 (1935); Spur Distributing Co. v. Husbands, 276 Ky. 521, 124 S. W. 2d 463 (1939); Hanna v. Safeway Stores, 223 F. 2d 858 (9th Cir. 1955); and see cases collected at 137 A. L. E. 362. It is not for the courts to impose restrictions upon the rights reserved by a party to a lease which the parties themselves did not see fit to impose. If the plaintiff in the present case felt that the rights reserved by the Department of the Navy were unfair or inequitable, it should not have agreed to the terms proposed. Having agreed to those terms, it is bound by them.
Even if we concede that the right of termination reserved by the Department of the Navy was restricted to its reasonable exercise, or that its exercise was restricted to circumstances bearing some relationship to the national emergency, the Navy Department’s action was fully justified. The shipyard in question was considered important to the national defense. Its mobilization potential had to be maintained particularly during a period of national emergency. The plaintiff-lessee, instead of maintaining that potential, was destroying it.
Plaintiff’s petition will be dismissed.
It is so ordered.
Laeamoee, Judge; Madden, Judge; Whitaker, Judge; and Jones, Chief Judge., concur.
EINDINGS OE FACT
The court having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and arguments of counsel, makes findings of fact as follows:
1. This is an action to recover the sum of $6,000,000, as damages for the alleged wrongful termination by the Department of the Navy of a lease to the plaintiff covering cer *766 tain premises known as the Naval Industrial Reserve Shipyard, located at Hingbam, Massachusetts.
On motion of the defendant, pursuant to Rule 38 (c), for a separate determination of liability, the court entered an order on February 17, 1956, limiting the trial of this case to the issues of law and fact relating to the right of the plaintiff to recover.
2. The plaintiff is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts, with a usual place of business in Boston, Massachusetts, and is authorized to conduct warehousing, manufacturing, general real estate management and other kindred activities. At all times pertinent to this action, the plaintiff corporation was organized and wholly owned by Charles J. O’Malley and his two sons, Louis J. O’Malley and Charles D. O’Malley. Louis J. O’Malley was the president of the corporation, Charles D. O’Malley was the treasurer, and Charles J. O’Malley was the clerk. These three individuals constituted the corporation. Charles J. O’Malley was 83 years of age in 1950 when the shipyard was leased to the plaintiff and did not take an active part in the company’s affairs.
3. Shortly after the United States declared war against Japan and Germany in December 1941, it located a naval shipyard in the town of Hingham, Massachusetts, upon a waterfront site where the Commonwealth of Massachusetts had ceded to it about 225 acres of land adjoining the Back River in the northeasterly part of Hingham. The Government constructed 71 buildings on the property which varied in size from 1,000 square feet to 500,000 square feet. These structures were built for the purpose of fabricating and constructing naval war vessels, particularly destroyers and destroyer escorts and also various types of landing craft such as landing craft infantry and landing craft tanks. The Government spent approximately $24,000,000 in such construction work, which included the preparation of the land for the buildings, the buildings themselves, a system of underground pipes and conduits for electricity, steam, water, sewage disposal and the distribution of industrial gases such as oxygen, hydrogen and acetylene. It also constructed *767 power stations for the distribution of high-tension electric power exceeding 13,000 volts.
Additional improvements included 16 shipbuilding ways capable of handling the construction of ships 300 feet long and 50 feet wide, 9 outfitting piers to outfit the the ships after they had been lanuched from the shipbuilding ways, a 214-mile railroad spur track to the main line of the New York, New Haven & Hartford Railroad, 3 locomotives, 75 flat cars, and various types of weight-lifting equipment such as locomotive cranes and truck cranes. The shipyard is now known as the Naval Industrial Reserve Shipyard, Hingham, Massachusetts, and hereinafter is referred to as “the shipyard”.
4. The shipyard was used by the Government during World War II for the construction and outfitting of naval war vessels from 1942 to 1945. At the termination of hostilities in August 1945, shipbuilding activities at the shipyard ceased, and for a period of approximately one year thereafter portions of the shipyard were used as storage facilities for the purpose of conducting war-surplus sales. In 1947 the property was placed in a caretaker status and a small force of men was employed for fire protection and guard service.
5. In 1948 the Department of the Navy determined that the shipyard should be retained in the inactive Naval Industrial Reserve. This designation covered property for which the Navy had no present need but which was placed high on its activation list for the future defense of the country. Instead of releasing the custody of such property to General Services Administration or other disposal agencies, the Navy retained full control of it in order that it could immediately recapture the property when this became necessary in the interest of national defense. In the event of a national emergency or war, the shipyard has a definite mobilization assignment which is the construction of at least 30 destroyer escorts and 13 destroyers as an adjunct of the Bethlehem-Hingham Shipyard, which was located nearby. The Bethlehem Steel Company was designated as a mobilization operator of the shipyard.
6. By reason of the termination of hostilities with the Axis Powers and the resultant curtailment of naval appropri *768 ations by the Congress, the Secretary of the Navy determined that for the time being the facilities of the shipyard were not required for public use and should be made available for private industrial use under the Act of August 5, 1947, (61 Stat. 774, 34 U. S. C. 522a).
7. Section 1 of the Act of August 5, 1947, referred to in the previous finding, provided in part as follows:
Whenever the Secretary of the Navy shall deem it to be advantageous to the Government he is authorized to lease such real or personal property under the control of his Department as is not surplus to the needs of the Department within the meaning of the Act of October 3, 1944 (58 Stat. 765), and is not for the time required for public use, to such lessee or lessees and upon such terms and conditions as in his judgment will promote the national defense or will be in the public interest. Each such lease shall be for a period not exceeding five years unless the Secretary shall determine that a longer period will promote the national defense or will be in the public interest. * * * Each such lease shall contain a provision permitting the Secretary to revoke the lease at any time, unless the Secretary shall determine that the omission of such provision from the lease will promote the national defense or will be in the public interest. In any event each such lease shall be revocable by the Secretary during a national emergency declared by the President.
8. About November 1949 the plaintiff entered into negotiations with the defendant which eventually culminated in an Agreement of Lease which was prepared by the defendant and covered a large portion of the shipyard. The Agreement of Lease was executed on May 26,1950, by the defendant and on May 29, 1950, by the plaintiff, but was made effective as of April 3, 1950. The lease was executed on behalf of the defendant by Jack E. Cochrane, the duly authorized contracting officer for the Bureau of Yards and Docks of the Department of the Navy, and on behalf of the plaintiff by Louis J. O’Malley, president of the corporation, and is identified under Navy Symbol No. NOy (R)-60241.
9. On or about February 1, 1950, pending the preparation and execution of a formal lease between the parties, the plaintiff was permitted to occupy a considerable portion of *769 the shipyard under an interim permit from tbe defendant, which was extended from month to month until the Agreement of Lease was executed.
10. On April 12, 1950, the District Public Works Officer of the First Naval District, who had administrative jurisdiction over the shipyard, addressed the following letter to the plaintiff:
In the administration of the terms of the Interim Permit for the occupancy of certain buildings at the Naval Industrial Reserve Shipyard, Hingham, Mass, by the Hingham Management Corp., and in the administration of the lease to be executed covering the entire Shipyard, it is not expected that the District Public Works Officer will have a site representative at all times at the Shipyard.
The District Public Works Officer, however, wishes to emphasize the fact that no Government-owned property or equipment located at the Shipyard is to be removed from the site for any reason without specific authority of this office, and no building alterations are to be made without similar authority, both as noted in the Interim Permit and proposed Lease.
11. The Agreement of Lease, which was made effective as of April 3, 1950, was for an initial term of five'years, renewable for two additional 5-year periods under certain terms and conditions, and included about 200 of the 225 acres comprising the shipyard or 1,100,000 square feet of the total area of 1,400,000 square feet, all of the shipbuilding ways and outfitting piers, the entire railroad trackage to the main line of the New York, New Haven & Hartford Railroad, and all but six or seven of the 71 buildings on the premises.
In addition to the real property rented to plaintiff under the terms of the lease, Article 1 (a) thereof provided that the lease also included personal property listed in exhibit “B” to the lease or added to such exhibit “B” from time to time. When the lease was executed, exhibit “B” attached thereto contained a list of readily identifiable heavy machinery and equipment such as locomotives, cranes, tractors, and trucks. Numerous other items of personal property located on the premises were later added to exhibit “B” by inventories made and agreed upon by plaintiff and defendant. The purpose of these inventories was to fix the liability *770 of the lessee for the personal property for which, it would be accountable upon termination of the lease.
12. The Agreement of Lease of April 3, 1950, contained the following recitals:
WHEREAS, the Government owns and the Department of the Navy (hereinafter called the Department) has custody, administration, control and jurisdiction of certain property known as the Naval Industrial Reserve Shipyard, Hingham, Massachusetts, (hereinafter called the “nirs”) which includes certain real and personal property, described in Article 1 below and hereinafter referred to as the “Facilities”; and
Whereas, the Secretary of the Navy (hereinafter called the Secretary) has determined that the Facilities are not surplus to the needs of the Department within the meaning of the Act of October 3,1944 (58 Stat. 765), but are not, for the time being, required for public use; and
Whereas, it has been determined that it will be in the public interest to lease the Facilities to the Lessee upon the terms and conditions hereinafter set forth; and
Whereas, this Lease is made under the authority of the Act of August 5, 1947, (61 Stat. 774, 34 USC Sec. 522a), and the approval of the Armed Services Committees of the Congress thereto has been obtained in accordance with the Act of April 14, 1944 (58 Stat. 189, 190);
The pertinent provisions of the lease are as follows:
Article 3. Use. The Facilities may be used by the Lessee for warehousing and light industrial purposes only and such additional purposes as the Department, at the request of the Lessee, may first authorize. In its use of the Facilities the Lessee shall, at its own expense, take all such precautions as are common to Industry, and such other precautions as the Department may reasonably require, to protect the Government-owned real and personal property from damage by reason of the Lessee’s operations. The Department shall have the right to remove, at the Lessee’s expense, or to demand the removal by the Lessee of, any machinery or equipment or goods, the presence or operation of which may, in the determination of the Department, occasion damage or injury to the Facilities.
*771 Article 5; Representation — Adaptation op Premises For Occupancy. The Lessee has examined and knows the condition and state of repair of the Facilities as of the date first above written, accepts them as such and hereby acknowledges that the Government has made no agreement or promise to alter, improve, adapt or repair any of the Facilities or any part thereof during the term hereof. The Lessee acknowledges further that no representations concerning the condition or state of repair of any item of the facilities or part thereof have been made by the Government prior to, or at the time of, the execution of this lease which are not set forth herein and, further, that this lease contains all the agreements made between the parties hereto. _ To the extent that the Facilities require repair, alteration or improvement in order to adapt them to the Lessee’s use for the purposes provided in Article 3 hereof, such adaptation shall be at the Lessee’s sole cost and expense.
* * * * *
Article 9. Risk op Loss — Insurance, (a) All risk of loss of, or damage to, the Facilities during the term of this lease, whether or not caused by the failure of the Lessee to exercise due diligence in complying with the provisions hereof, shall be borne by the Lessee; provided, however, that the Lessee’s liability for loss or damage to the Facilities resulting from risks expressly required to be insured hereunder shall not exceed the amount of insurance so required to be procured and maintained or the amount of insurance actually procured and maintained, whichever shall be the greater, and provided, further, that the Lessee shall not be liable for loss of, or damage to, the Facilities arising from causes beyond the control of the Lessee and occasioned by a risk not in fact covered by insurance and not customarily covered by insurance in the locality in which the Facilities are situated. Nothing contained herein, however, shall relieve the Lessee of liability with respect to any loss of, or damage to the Facilities not fully compensated for .by insurance, which results from willful misconduct, lack of good faith or failure to exercise due diligence, on the part of any of the Lessee’s officers, directors or representatives having supervision or direction of all, or substantially all, of the Lessee’s operations at the NXRS.
* * * * *
Article 12. Termination. This lease may be terminated by the Department at any time prior to the expiration of the term hereof:
*772 (a) During any national emergency declared by the President or.Congress;
(b) Upon 90 days’ written notice to the Lessee whenever the Secretary shall determine that the interests of national defense so require;
(c) Upon 90 days’ written notice to the Lessee whenever the Secretary shall determine that the Facilities are surplus to the further needs and responsibilities of the Department;
(d) Upon 10 days written notice to the Lessee (i) if the Lessee shall have defaulted in the performance of any of its obligations hereunder and shall not have corrected such default within 10 days after receipt of a notice from the Department specifying such default, or within such longer period of time as the Department may determine to be reasonable and appropriate under all the circumstances to permit the Lessee, acting with due diligence, to- cure such default, or (ii) in the event of the filing of a petition by or against the Lessee for adjudication as a bankrupt, for reorganization or for arrangement within the meaning of the Bankruptcy Act as now or hereafter amended, and in the further event that such petition, if filed against the Lessee, remains undismissed for a period of sixty (60) days, or in the event of the appointment of a ^Receiver or Trustee of the property of the Lessee. In the event of termination, the Department may at its election relet the whole or any portion of the Facilities for any period equal to, greater than, or less than the remainder of the term of this lease to any person, for any sum and upon any terms deemed by the Department to be reasonable and satisfactory.
$ $ ‡ ‡
Aeticle 18. General Provisions, (a) Failure of Government to Insist on Compliance. The failure of the Government to insist, in any one or more instances, upon performance of any of the terms, covenants or conditions of this lease shall not be construed as a waiver or relinquishment of the Government’s right to the future performance of any such terms, covenants or conditions and the Lessee’s obligations in respect of such future performance shall continue in full force and effect, and the receipt and acceptance of rent shall not be. deemed to be. a. waiver of any breach or default by Lessee of any provision of this lease nor shall it invalidate or impair the efficacy of any termination or notice of termination hereunder unless expressly so agreed in writing by the Department.
* ❖ 1 ❖ * *
*773 (g) Definition of “Department”. “Department”, as used in this lease, shall mean the Secretary of the Navy, the Chief of the Bureau of Yards and Docks, the Officer in Charge of this lease, and such other duly authorized representative or representatives as the Secretary or the Chief of the Bureau of Yards and Docks may designate from time to time.
* * * * *
ARTICLE 20. Administration. The administration of this lease will be under the general direction of the Chief of the Bureau of Yards and Docks, known as the “Contracting Officer”. The Contracting Officer shall designate an officer of the Civil Engineer Corps, United States Navy, or other representative of the Department as Officer in Charge of Contract, who shall, under the direction of the Contracting Officer, have complete charge of the administration of this lease and shall exercise full supervision and general direction of this lease, so far as it affects the interest of the Department.
* * * % *
13. At the time the Agreement of Lease was entered into, many of the facilities demised to plaintiff were in disrepair. The wooden staging on top of the 16 concrete shipways was in poor condition and constituted a fire hazard because of the electric wiring that had been strung through the wooden members for lighting purposes. The planking on the nine outfitting piers was deteriorated to the extent that they could not have been used for shipfitting purposes without extensive repairs. The buildings were in need of painting, and the roofs on many of them leaked. The fire control system was not operating.
Article 5 of the Agreement of Lease stated that the lessee had examined the premises and accepted them with full knowledge of their condition and state of repair.
As a consideration for the use of the shipyard, plaintiff agreed to pay the Government the sum of $1.00 rental per year in advance, and further agreed to protect, preserve, maintain, and repair the leased facilities as directed by the Navy from time to time. Article 7 of the Agreement, which set forth the maintenance obligations of plaintiff, stated that the lessee would not be required to spend more than $100,000 per year in maintaining and repairing the leased facilities. The same article provided that the lessee would not be ob *774 ligated to spend any portion of such amount for the maintenance or repair of the piers, bulkheads, or shipways so long as the remainder of the leased facilities required any maintenance, preservation, or repair.
During the term of the lease, a dispute arose between the parties with respect to plaintiff’s compliance with the maintenance provisions of the Agreement, but evidence relating thereto was excluded on the ground that the Agreement was not terminated pursuant to the provision which authorized cancellation because of any alleged failure of the lessee to repair and maintain the property as required. Therefore, plaintiff’s compliance with the maintenance provisions of the Agreement is not an issue at this state of the proceedings in this action.
14. The plaintiff paid the Government the annual rental of $1.00 by checks dated June 7,1950, May 25,1951, April 15, 1952, and July 29,1953. These checks were accepted by the defendant.
15. Article 18 (c) provided that no part of the leased facilities could be subleased or otherwise made available to any third party by plaintiff without the written consent of the Department of the Navy. Pursuant to this provision, a number of sub-tenants occupied portions of the leased premises during the term of the Agreement.
On April 10, 1951, Louis J. O’Malley, president of plaintiff, wrote the Mobilization Director of the Office of Defense Mobilization, stating that plaintiff’s opportunities to sublet portions of the leased premises to various desirable tenants had been prevented by the refusal of the prospective tenants to occupy the premises under a lease agreement containing a “recapture” clause in behalf of the Navy, and requested that this clause be deleted from the Agreement. The letter was referred to the Assistant Secretary of the Navy who, on June 4,1951, replied in pertinent part as follows:
The capacity of the Naval Industrial Reserve Shipyard, Hingham, Massachusetts, has been determined to be required for the mobilization needs of the Department of the Navy. Since the yard was not required for the immediate needs of the Department, it was leased to the Hingham Management Corporation in accordance with Departmental policy. It was the intent of the *775 Department, in entering into such a lease, that when the yard would be required for shipbuilding purposes the lease would be cancelled and the shipyard would revert to its intended use. Therefore, the lease included among other things, a right on the part of the Government to terminate. Such right of termination is not only consistent with the established policy of the Department of Defense but, with the exception hereafter noted, is affirmatively required by Public Law 364 (80th Congress). [Here follows a quotation of the last two sentences of the language of the act set forth in finding 7]
The language of the last sentence of the above provision indicates beyond any doubt that the Secretary of the Navy has no authority to omit the requirement that the lease may be revoked during a national emergency. The first sentence does permit the omission of the requirement that it may be revoked for any other reason, when the Secretary makes appropriate findings. Even if there had been a private understanding that the lease would not be revoked, such an understanding would be contrary to the spirit of the law and, hence, void.
As noted in your letter, the intent and application of the termination clause was mutually understood, when the lease agreement was entered upon.
In summary, the Department of the Navy: (i) will require the Hingham Shipyard for shipbuilding purposes in its mobilization plans; (ii) finds that there is no authority to eliminate the termination provisions of the lease agreement and even were there such authority, would object, under present conditions, to such removal; (iii) advised the present lessee at the time of negotiation of the lease agreement of the intent of the Department to terminate in the event the facilities were needed for shipbuilding purposes; and (iv) cannot compel private companies or Government agencies to enter into subleases with or to grant work to the present lessee if they are unwilling to do so in view of the termination clause.
I am sure that you will understand the Navy’s position in this matter. A facility, costing some twenty-four millions of dollars, and which would be a vital link in our shipbuilding program, could not be tied up because some company was using a fractional portion for their own particular needs and could not be evicted. Under such conditions, the Government would be forced to replace, with consequent loss of time, money and production capacity, the whole shipyard simply because some small, but vital portion of the old one was not subject to recapture for its intended use.
*776 16. On December 16, 1950, the President proclaimed the existence of a national emergency, which is still in effect.
17. During April 1953, the District Public Works Officer learned that many items of Government-owned property were missing from the shipyard. He immediately requested the District Office of Naval Intelligence to make an investigation for the purpose of determining what items were missing that were vital to the mobilization mission of the shipyard, and also employed an independent firm to make an investigation for the same purpose. As a result of the reports he received, he recommended to the Commandant of the First Naval District that the Department of the Navy take immediate action to oust plaintiff from the shipyard before any further thefts or damage could be committed.
In a telephone conversation of August 2,1958, a representative of the District Public Works Office informed the Chief of the Eeal Estate Division of the Bureau of Yards and Docks ■in Washington, D. C., who had signed the lease as contracting officer, that the Federal Bureau of Investigation had made a report to the United States Attorney for the District of Massachusetts concerning acts of vandalism and theft that had taken place at the shipyard. A preliminary report was sent to the Secretary of the Navy regarding the removal of property from the yard, and a representative of the Eeal Estate Division was sent to Boston on September 15, 1953, to consult with the local officials of the Department of the Navy, the FBI, and the United States Attorney in order to obtain firsthand information concerning the situation. As a result of the information obtained in Boston, the contracting officer (the Chief of the Bureau of Yards and Docks), and other Department of Navy officials determined that the mobilization potential of the shipyard had been seriously jeopardized as a result of the removal of Government property therefrom and that plaintiff’s lease should be terminated immediately in order to prevent further thefts of property from and damage to the shipyard. On October 2, 1953, a memorandum was forwarded to the Assistant Secretary of the Navy, recommending that plaintiff’s lease of the shipyard be terminated at once, pursuant to Article 12 (a) of the lease, for the reasons stated above.
*777 18. On October 22, 1958, a formal notice of termination was signed by tbe Assistant Secretary of the Navy and was delivered to the plaintiff and its officers on October 29, 1953, as follows:
Reference is made to agreement of Lease, identified as Contract NOy(R)-60241, dated May 29, 1950, effective as of April 3, 1950, as amended, between yon and the United States of America, under the terms of which certain facilities at the Naval Industrial Reserve Shipyard, Hingham, Massachusetts, were leased to you. ■
Under the authority of Section 1 of the Act of August 5, 1947 (61 Stat. 774, 34 USC 522a) and Presidential Proclamation No. 2914, dated 16 December 1950, proclaiming the existence of a national emergency (64 Stat. A454) and pursuant to the provisions of Article 12 (a) of said Agreement of Lease, said Lease is hereby terminated. Such termination will be effective upon the receipt of this letter by you.
This termination notice shall not be construed to prejudice any rights the Government may have with regard to any default on your part in the performance and discharge of your obligations under said Agreement of Lease and shall in no way affect the notice of a finding of a default, dated October 14, 1952, forwarded to you by the Acting Chief of the Bureau of Yards and Docks.
The District Public Works Officer of the First Naval District has been directed to take possession of the facilities covered by said Lease, and you are required and directed to surrender the same to him, or to his duly authorized representative, immediately.
19. The Chief of the Real Estate Division of the Bureau of Yards and Docks, other Navy officials, and an armed Navy guard arrived at the shipyard at 8 a. m. on October 29,1953: The notice of termination was delivered to Louis J. O’Malley^ president of plaintiff, at 9:30 a. m. on the same day, with a verbal request that plaintiff peaceably surrender possession of the premises. He requested that he be allowed two hours to consider the matter, and at 1Í a. m., he delivered to Navy officials a letter acknowledging receipt of the notice that the lease had been terminated pursuant to Article 12 (a) and further stating:
* ❖ sH * *
All rights of the Hingham Management Corp. are hereby preserved and notice is hereby given to you, as *778 a representative of the Navy, that substantial damages have been suffered by the Corp. because of your action.
Thereupon, the Department of the Navy took possession of the shipyard.
20. Prior to the termination of plaintiff’s lease, the Department of the Navy had made arrangements to place the General Public Warehouse Company of Massachusetts in possession of the shipyard under an interim lease to be effective upon the termination of plaintiff’s lease. The transaction with General Public Warehouse Company of Massachusetts was made for two reasons. First, the loss of time that would have been entailed in making funds available for the direct operation of the shipyard by the Navy would have interfered with its decision to take possession of the yard immediately. In the second place, the Navy desired to avoid dispossession of and consequent financial loss to various subtenants of plaintiff, who were not involved in the removal of Government property.
The interim lease between defendant and General Public Warehouse Company of Massachusetts, dated October 28, 1953, was in effect from the date plaintiff’s lease was terminated until about one year later when a formal lease of the shipyard was entered into with the Allied Mortgage Company.
At the time General Public Warehouse Company of Massachusetts took possession of the shipyard under the interim permit and at the time the premises were leased to Allied Mortgage Company, the Department of the Navy had made a determination that the shipyard was not, for the time being, required for public use.
21. The notice of termination was delivered to the plaintiff without previous notice, without warning, and without an offer on the part of the defendant to compensate plaintiff in any amount. Defendant contends that the lease was legally and properly terminated by the defendant pursuant to and in accordance with Article 12 (a) of the Agreement of Lease and that no previous notice, warning or offer of compensation on the part of the defendant was necessary or required by said Article 12 (a) of the Agreement of Lease.
*779 22. As a result of the several investigations made and an inventory taken after the lease had been terminated, it was ascertained that a large quantity of Government-owned property and equipment, which were on the leased premises at the time plaintiff entered into possession of the shipyard on February 1,1950, were missing at the time the Department of the Navy regained possession of the premises on October 29,1953. A considerable amount of the missing material was included in the lease, either by inventories attached as exhibit “B” pursuant to Article 1 (c) of the Agreement, or as part of the real property covered by the lease. The missing material included 570 metal boxes, 208 wooden lockers, 34 electric water coolers, 17 steel bending blocks, 41 chain hoists, 45 hand trucks, 693 filing cabinets, 6 electric calculators, 643 wooden chairs, 65 wooden desks, 38 drafting tables, 386 tables of other types, 24 used typewriters, 2 coffee urns, 14 paint-spraying outfits, 6,000 feet of circular military electric cable, and 7,500 feet of ^-inch-diameter bare copper wire. The electric cable was not listed in the inventory attached as exhibit “B” to the Agreement of Lease. Part of the electric cable was on reels and stored in the warehouse at the time plaintiff took possession of the premises. A portion of the same cable was a part of the real property leased to plaintiff, since it was submarine cable which was attached to and ran underneath the concrete shipways. It was ripped out from the shipways and disappeared during plaintiff’s occupancy of the premises.
Although the evidence is not sufficient to establish the value of the missing property for the purposes of assessing damages, the proof is sufficient to show that it would cost the Department of the Navy a very substantial sum of money to replace the missing material and equipment.
23. The extent to which the mobilization assignment of the shipyard would be affected by the loss of the Government-owned property that was removed from the shipyard depends upon the length of time that would be required to replace particular pieces of equipment at the time they would be needed in the event of a national emergency or war. Some of the items could be obtained in a short period of time. For *780 other items, such as the submarine electric cable, a period of six to eight months would be needed for their replacement.
24. In January 1954, a Federal grand jury in the District of Massachusetts returned an indictment in four counts against Louis J. O’Malley, the president and principal officer of the plaintiff, and against Joseph Moffie and Millard Moffie, two of the plaintiff’s employees, for conspiracy and theft of Government-owned property at the shipyard. The first count was based upon 18 IT. S. C. 371, the criminal conspiracy statute, and charged all three defendants with having engaged in an unlawful conspiracy between March 10, 1950 and March 1, 1952, to commit certain offenses against the United States, namely, to knowingly and wilfully violate 18 U. S. C. 641, the embezzlement and theft statute, and
to knowingly and wilfully embezzle, steal, purloin and knowingly convert to their own use and to the use of others, and without authority, to sell, convey and dispose of things of value of the Department of the Navy of the United States, to wit: electric cable, furniture, iron boxes, and other personal property and fixtures located at the Naval Industrial Eeserve Shipyard in Hingham in said District,* * *.
Numerous overt acts in furtherance of the conspiracy were set forth in the first count. The remaining counts of the indictment related to specific acts of theft by each defendant in violation of 18 U. S. C. 641.
The defendants were tried before a jury in the latter part of 1954 and were found guilty of the offenses charged in the indictment. Louis J. O’Malley was sentenced to prison for a year and a day. Joseph Moffie and Millard Moffie received sentences of four months and three months respectively.
25. The convictions of Louis J. O’Malley and the Moffies were affirmed by the United States Court of Appeals for the First Circuit on November 23,1955, (O'Malley v. United States, 227 F. 2d 332) and petitions for certiorari were denied by the Supreme Court of the United States on February 27, 1956 (350 U. S. 966).
26. In some of the transactions involving the sale of the Government-owned equipment and material from the shipyard, the purchasers of the stolen property issued checks pay *781 able to Hingham Management Corporation. Of these, some were endorsed “Hingham Management Corp. by Louis J. O’Malley, Pres.”, and there was a second endorsement reading “Deposit to % Louis J. O’Malley”. Others were endorsed “Hingham Management Corp., Deposit to % of Hingham Service Co.”. In other instances, the purchasers issued checks payable to the Hingham Service Company, and when these checks were deposited, they were indorsed “Hingham Service Co.”. Three checks were made payable to J. Moffie and were first endorsed by him and then by “Hingham Service Co.”.
The relationship of the Hingham Service Company to the plaintiff corporation is disclosed in a series of letters in evidence as defendant’s exhibits 18 to 20 inclusive. On February 1, 1952', the District Public Works Officer wrote plaintiff, inquiring whether plaintiff had sold any of the Government-owned property covered by the lease and requesting that plaintiff furnish a list of the articles sold and the names of the purchasers. In a reply of February 5,1952, signed by its president, plaintiff wrote that it had sold no Government material or equipment with the exception of a pile of cinders and some scrap lumber — sales that had been authorized by the Navy. Apparently, the District Public Works Officer was not satisfied with this reply, because on February 19, 1952, he again wrote plaintiff, requesting information about the sale of Government-owned property by plaintiff’s agents, servants, or employees. The letter read in pertinent part as follows:
Additionally, we understand that the Hingham Service Company is either a subsidiary or an agent of your Company formed for the purpose of servicing your tenants within the area leased by Lease Contract NOy(K)-60241.
Accordingly, you are directed to additionally inform this office immediately of any and all sales of Government-owned equipment or material made by the agents, servants and/or employees of the Hingham Management Corporation.
You are further directed to inform this office immediately of any and all sales of Government-owned equipment or material made by the Hingham Service Company or its agents, servants and/or employees' which *782 was located within the confines of the area leased to the Hingham Management Corporation. An itemized list of the articles sold and the name and address of the purchaser or purchasers is also requested.
Plaintiff’s reply of February 27, 1952, was signed by its president, Louis J. O’Malley, and stated:
Receipt is acknowledged of your letter of 19 February, 1952. In answer to your previous letter of 1 February 1952, consideration had been given to paragraph #3 contained therein. As your office has been informed, the Hingham Service Company is the means by which the Hingham Management Corporation services the tenants within the confines of the area leased under Lease Contract NOy(R)-60241.
An inquiry of all of the agents, servants and employees of the Hingham Management Corporation and the Hingham Service Company shows that no sale had been made by them of Government-owned equipment or materials located within the confines of the area leased to the Hingham Management Corporation, other than that specifically directed by your office in previous letters.
The evidence shows that the Hingham Service Company was not incorporated but was solely owned by Louis J. O’Malley.
27. Neither the plaintiff corporation nor Charles D. O’Mal-ley, the treasurer of plaintiff, nor Charles J. O’Malley, the clerk of the corporation, was included in the indictment referred to in finding 24. Charles D. O’Malley had no knowledge of the removal and sale of Government-owned property from the shipyard or of the proceeds of the sales. Louis J. O’Malley, the president of the corporation, did not show him the correspondence that passed between the District Public Works Officer and plaintiff as described in the preceding finding.
There is no evidence that Charles J. O’Malley had any knowledge of the removal and sale of Government-owned property from the shipyard, or of the proceeds of the sales of the property, or of the letters referred to in the preceding finding.
Charles D. O’Malley, brother of Louis J. O’Malley and treasurer of plaintiff was engaged principally in attempting *783 to find sub-tenants for portions of the shipyard and in handling insurance matters relating to plaintiff. During the time pertinent to this transaction, plaintiff had an office in the shipyard and another in Boston, Massachusetts. Charles D. O’Malley carried on his activities as treasurer in the Boston office. He was not at the shipyard at any time in 1950, the year when most of the Government-owned property was removed and sold. In 1951, when some of the property was removed and sold, he spent most of his time at the Boston office but visited the shipyard about three times a week. He deposited some of the checks payable to plaintiff, but as previously stated, he saw none of the checks which were issued in payment of the stolen property. Many of the checks which were received from day to day by plaintiff were handled in its office in the shipyard.
As stated in a preceding finding, the father, Charles J. O’Malley, was 83 years of age when the shipyard was leased to plaintiff and had little to do with the affairs of the plaintiff corporation. He was never in the shipyard during the winter months, but during the summer, he stopped there about once a month while enroute to his summer residence.
28. No Navy fighting ships have been constructed at the shipyard since plaintiff’s lease was terminated, nor has the copper wire or electric submarine cable been replaced. The shipyard is ready to carry out its mobilization assignment when required, but considerable repairs to the property, as well as the replacement of equipment, will be necessary before ships can be constructed there. The buildings have been made watertight, and the steam, electrical and water facilities in the buildings are in opérating condition. These are the principal items needed at the outset of the yard’s mobilization activities. Preparations have been made for organizing the drafting rooms, and the drafting equipment can be obtained in a short time. The scaffolding on the shipways can be replaced as work is being done on new vessels. The replacement and installation of the electric cable beneath the shipways is the most critical item for, as already stated, a period of six to eight months may be required to obtain delivery of the cable. Since the outfitting piers are not used until after the ships are constructed and since it *784 takes at least four months to build even a small vessel, the piers can be repaired and made ready before any ships are completed.
29. Plaintiff made formal demand upon the defendant, and particularly upon the Assistant Secretary of the Navy, for the return of the leased property or for fair and adequate termination adjustments. The defendant refused and has continued to refuse either to return the shipyard to the plaintiff or to pay it damages and termination adjustments and contends that it is under no liability to plaintiff.
30. On the basis of the information received by them in the fall of 1953 (finding 17), the Navy officials, who recommended that plaintiff’s lease be terminated, had good cause for believing and advising the Assistant Secretary of the Navy that the theft of and damage to Government-owned property in the shipyard adversely affected the capacity of the yard to perform its mobilization assignment. Their objective was to have the Department of the Navy take action which would enable it to re-possess the shipyard as quickly as possible to prevent further thefts, and they recommended that the lease be terminated pursuant to Article 12 (a) in order to accomplish that objective.
CONCLuSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff is not entitled to recover and the petition is therefore dismissed.