## MACO WAREHOUSE COMPANY CALIFORNIA

v.

## UNITED STATES.

No. Cong. 2-56.

United States Court of Claims.
Jan. 14, 1959.

Lawrence Edwards, Stockton, Cal., for plaintiff. Warren H. Atherton, Stockton, Cal., on the brief.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen., Perry W. Morton, for defendant.

MADDEN, Judge.

The House of Representatives, having before it a bill, H. R. 7176, "for the relief of the Maco Warehouse Company," adopted, on March 6, 1956, House Resolution 406, 84th Congress, 1st Session, referring the bill to this court for its action pursuant to sections 1492 and 2509 of the Judicial Code, 28 U.S.C. §§ 1492 and 2509. The plaintiff filed its petition in this court pursuant to the cited sections of the Code, seeking to recover the net profits which it claims it would have realized from the operation of a Government-owned warehouse if the Government had not terminated its lease of the warehouse, and the cost of certain installations and improvements made by the plaintiff and left in the premises at the request of and inuring to the benefit of the Government.

On May 29, 1950, the Department of the Army invited bids for the lease of two Government-owned warehouse buildings containing 358,000 square feet of storage space located at the Stockton, California, Sub-Depot of Benicia Arsenal. The Sub-Depot had been declared surplus by the Army, and was, by statute, 61 Stat. 774, 34 U.S.C.A. § 522a and Army Regulation 100–62, as supplemented, made available for leasing, with the Corps of Engineers being the Government's agency in making the proposed lease. The invitation for bids had attached to it a copy of the form of the lease which the successful bidder would be required to sign. The invitation stated that the lease would be for the period June 20, 1950, to June 19, 1951. The attached lease form included a provision that the lease was "revocable at will by the Secretary of the Army."

The plaintiff was the high bidder. A formal draft of the lease was given to the plaintiff for signature. Before signing, two of the members of the plaintiff partnership went to see the Chief of the Management and Disposal Branch of the Real Estate Division, Corps of Engineers, in San Francisco. They said that the revocability provision in the proposed lease would interfere with their intended use of the property as a warehouse. They were told that the provision was required by statute, Act of August 5, 1947, 61 Stat. 774, and could not be eliminated. But they were told that there was in effect a regulation of the Department of the Army stating that such leases would not be revoked except for military needs which were not foreseen at the time the leases were executed.

The plaintiff executed the lease. It was executed by an official acting for the Secretary on June 23, 1950, and the plaintiff took possession on or about that date. The term of the lease was, as the invitation for bids had stated, the one-year period from June 20, 1950, to June 19, 1951. The rental was $64,708 per annum.

The plaintiff used the property as a commercial warehouse. Business was good and at the end of four months 90 percent of the available space had been

rented to customers and the remaining space was rapidly filling up.

In the meantime, on June 25, a few days after the signing of the lease, hostilities broke out in Korea. Almost immediately military equipment and material were shipped out of warehouses in the Stockton area to Korea, in great quantities. Other great quantities of such material were being procured by the Army and shipped to an Army storage depot, named Sharpe General Depot, near the plaintiff's leased property.

The Quartermaster General of the Army, in view of greatly increased Army procurement, was endeavoring to obtain additional warehouse space almost anywhere in the United States. On July 26, 1950, he requested the Chief of Staff of the Army to transfer the Stockton Sub-Depot to the jurisdiction of the Sharpe General Depot. He pointed out military reasons why an immediate increase in storage space was necessary in the area of the Port of San Francisco. The details of his justification for his request are stated in our finding 16.

The requested transfer of jurisdiction over the Stockton Sub-Depot was made on August 24, 1950. On August 25, 1950, an official of the Office of the Quartermaster General requested the Assistant Chief of Staff to terminate the plaintiff's lease for military necessity. The Assistant Chief of Staff on September 8, 1950, wrote to the Quartermaster General calling attention to the fact that the cancellation of the plaintiff's lease would result in strong protests by the lessees and by local civil and political organizations. He urged that the Quartermaster General review the total requirements, availability and utilization of warehouse space which was already under his control in the San Francisco-Stockton area in order to determine whether or not they would be sufficient to meet military requirements until the date of expiration of plaintiff's lease in 1951. The Assistant Chief of Staff was of the opinion that more adequate support was needed to justify the proposed cancellation. A re-

view of the situation was made by the Quartermaster General. The record does not indicate upon what information that office ultimately acted, but on October 10, 1950, the Quartermaster General again recommended to the Assistant Chief of Staff that the plaintiff's lease be cancelled, and on October 10, 1950, the Assistant Chief of Staff accordingly directed the Chief of Engineers to terminate the plaintiff's lease on the Stockton Sub-Depot. On November 1, 1950, formal notice of revocation of its lease was delivered to the plaintiff, giving the plaintiff 45 days within which to vacate the premises. This notice was informally extended to February 1, 1951.

The plaintiff began, about November 7, 1950, to vacate the premises. As the plaintiff vacated space, the Army filled it with military goods. By February 1, 1951, the plaintiff had vacated practically all the space. As we have said, there was, in all, some 358,000 square feet of space in the property. The Army stored goods occupying 243,000 square feet of this space, as rapidly as the goods could be transferred from a Navy warehouse which the Army was obliged to vacate. It appears that the rest of the space in the Stockton Sub-Depot was not filled by June 19, 1951, the date when the plaintiff's lease would have expired.

The Resolution of the House of Representatives, referring this case to this court, requests the court to inform the House as to the nature and character of the demand, legal or equitable, which the plaintiff may have against the United States.

■ The plaintiff does not have a legal claim against the United States. The plain provision in the lease, the presence of which in the lease was required by an Act of Congress, that the lease was revocable at the will of the Secretary of War, made the Secretary's revocation entirely lawful. Hingham Management Corp. v. United States, Ct.Cl., 166 F.Supp. 615 Army Regulation SR 210–15–1 which provided in general that a lease contract of this sort should not be terminated by the Army except for military require-

ments not foreseeable at the time of the execution of the lease (finding 6), was, in our opinion, merely a declaration of policy to be followed wherever possible. We do not believe that the spirit of this regulation was violated in the instant case inasmuch as the record establishes the fact that military requirements arose after the execution of the lease which were not foreseeable at the time of its execution.

In justification of its position that equitably it is entitled to relief, the plaintiff points to the following facts: that the bulk of the storage in the leased premises consisted of processed food supplies needed by the military; that a portion of the storage was actually utilized by an instrumentality of the Government, i. e., the Commodity Credit Corporation, for the storage of edible dried beans, a commodity usually needed by the Army; that it was questionable that the use of the leased premises for the transfer and storage of supplies from the Naval Annex was of greater military importance than the maintenance of storage space for the food supplies already stored in the warehouse; that there is no showing that any of the goods transferred from the Navy warehouse to the plaintiff's warehouse were ever actually shipped for military use to Korea; that the Quartermaster Department had at its disposal other adequate facilities at the Mira Loma Depot which remained empty; that Colonel Romain of the Office of the Quartermaster General never actually furnished any support for his position that Mira Loma was not a feasible location for storage; and that the Quartermaster General erred in not utilizing the vacant area of available warehouse space at the Stockton Naval Annex which remained available during the entire period involved in this suit.

Assuming that the above facts relied on by the plaintiff are substantially established by the record, they represent facts which under the circumstances of this case, were ascertainable more by hindsight than by foresight. The Quartermaster Department could no more accurately predict the precise extent of its need for storage facilities during the early days of the Korean conflict than the Department of Defense could predict the course of events in that conflict. Under all the circumstances, it seems clear that if the Army erred in deciding that it required plaintiff's facilities prior to the expiration of the lease, it erred on the side of caution. The outbreak of hostilities in Korea, coming so soon after the consummation of the plaintiff's lease, was a misfortune and a disappointment to the plaintiff. The officials of the Army used their honest judgment as to the country's military needs for storage space close to the port of San Francisco. They did not hastily or inconsiderately terminate the plaintiff's lease. After termination they allowed the plaintiff to make an orderly removal of the goods stored in the premises, filling up most of the space with military goods as the plaintiff removed the civilian goods. There was no reason why, having expressly reserved the right of revocation, the Army should seek out other storage space at inconvenient locations and at added expense. Military needs were given priority, and were legally and equitably entitled to such priority.

Congressional provision for equitable relief in a case such as this is designed to protect the citizen against loss through arbitrary although lawful actions on the part of the Government. We cannot say that the Army acted arbitrarily in this case where its only error was to be deficient in the gift of prophecy. We are accordingly of the opinion that plaintiff has neither a legal nor an equitable claim against the United States in connection with the termination of its lease.

In addition to its claim, legal or equitable, for loss of profits caused by the termination of its lease, plaintiff asserted in its petition a claim in the amount of $4,750.50 for the cost of labor and material required in making repairs, improvements and alterations to the facilities and for the cost of installing certain electrical facilities.

Paragraph 18 of the lease required the plaintiff to procure and maintain fire and extended coverage insurance on the leased premises to the full insurable value thereof. In order to reduce the cost of the insurance it was necessary for plaintiff to demolish two lean-tos which were attached to the two principal buildings. The lean-tos were in bad condition and constituted a fire hazard. The plaintiff was advised by the post engineer that his office had no funds available for the removal of the lean-tos. The plaintiff proceeded to demolish the lean-tos and at the time the insurance policies were delivered, plaintiff's representative informed the District Engineer's office that it had been necessary to tear the lean-tos down in order to get the required insurance coverage. Although plaintiff did not obtain the formal approval or consent of the Department of the Army before removing the lean-tos, no objection was made at the time of removal or thereafter by the representatives of the Department (finding 9).

In addition to removal of the lean-tos, plaintiff had to make certain other repairs to the leased facilities in order to render them usable for operation as warehouses. This work involved reconditioning the sidings and doors, patching the roofs and installing new glass in the skylight and the cost to the plaintiff was approximately $2,234.21. In addition, because the Ordnance Department in vacating the premises prior to plaintiff's lease, had removed all of the electrical wiring and transformers, it was necessary for the plaintiff to employ an electrical contractor to install new transformers, conduits and wiring for lighting the buildings. Sometime after November 1, 1950, while the plaintiff was engaged in evacuating its goods from the warehouse so that the Army could move in its supplies, one of the plaintiff's partners discussed the installation of the electrical equipment with the post engineer of Sharpe General Depot. The post engineer asked the plaintiff to leave the electrical facilities in the building and he stated that the Army would ap-

prove a work order to reimburse the plaintiff for the cost thereof. The record shows that the plaintiff had expended $1,549.01 for the installation of the electrical equipment. It submitted a claim to the Army in the total amount of $4,750.50, which included not only the installation of the electrical equipment but also the cost of labor and material expended in removing the two lean-tos and in making the other repairs to the building mentioned above.

On March 19, 1951, after plaintiff had vacated the premises, the executive officer of Sharpe General Depot forwarded the above claim of the plaintiff to the District Engineer in San Francisco with a statement that although the plaintiff had not been directed nor given permission to make the repairs and improvements covered by the claim, it was considered that the work done by the plaintiff was of benefit to the Government. The letter went on to state that Sharpe General Depot had no funds available for the reimbursement of these expenses. In the course of subsequent investigations in connection with this claim for reimbursement, the Army determined that the plaintiff had not been authorized by the District Engineer to make any of the repairs, additions, or improvements to the leased premises and the claim was accordingly denied.

Paragraph 3 of the lease provided that the lessee had inspected the premises, knew the condition thereof, and that the lease was made without any warranty of condition of the premises and without any obligation on the part of the Government to make repairs or alterations. The Government contends that in the light of this provision in the lease all of the alterations and repairs were made for the convenience of the lessee who acquired no legal or equitable right to reimbursement from the lessor. For some reason not clear from the record, the plaintiff has elected to abandon this claim as such and to treat it as merged in its overall claim of $225,000 representing financial losses sustained because of revocation of the lease. These repair expenses in-

curred by the plaintiff had nothing to do with the revocation of the lease and the question as to whose obligation they were would have existed had the lease been allowed to run its full term. H.R. 7176 provides that the Secretary of the Treasury is authorized and directed to pay to the plaintiff $229,750.50 in full settlement of all claims of the plaintiff against the United States on account of the cancellation of the lease and also on account of alterations and repairs required to be made to the leased premises. House Resolution 406 referred the bill to this court for findings of fact and conclusions revealing the nature and character of the claims covered by the House Bill as legal or equitable against the United States. The Trial Commissioner has made findings with respect to the plaintiff's claims involving the expense of alteration and repairs and despite the apparent abandonment of this claim by the plaintiff, we feel obligated to make findings and to state our conclusions with respect to the character of those claims.

■ With respect to the claim for the expense of demolishing the lean-tos, we are of the opinion that this does not represent either a legal or an equitable claim against the United States. Although the lease required the plaintiff to procure and maintain fire and extended coverage insurance on the leased property to the full insurable value thereof, the removal of the lean-tos was not essential to the procurement of such insurance but was done rather to reduce the cost of the insurance. Plaintiff certainly has no legal claim against the Government for reimbursement of such expense and since it is doubtful that the Government secured any benefit from the demolition of the lean-tos, we are also of the opinion that the plaintiff has no equitable claim to reimbursement for this item.

■ With respect to the reconditioning of the siding and doors, the patching of the roof and the installing of new glass in the skylight, the plaintiff was required by paragraph 3 of the lease to bear the expense of any repairs and alterations which it considered necessary and, under that paragraph of the lease, the plaintiff in a sense leased the property "as is". We are of the opinion that the Government was under no legal obligation imposed by the lease to reimburse the plaintiff for such repairs and no one acting under authority from the Government indicated to the plaintiff at the time it made such repairs that it would be reimbursed for the expense thereof. On the other hand, at the time of the revocation of the lease, the executive officer of Sharpe General Depot was of the opinion that the repairs in question had improved the facilities and were of benefit to the Government. Accordingly, we recommended to Congress that plaintiff be reimbursed for this item, as an equitable claim against the United States, in the amount of $2,234.21.

■ Plaintiff did not obtain permission to install the electrical equipment in the warehouses, but, at the time of the revocation of the lease a responsible official of the Government requested the plaintiff to leave the equipment in the buildings and he stated that the Army would approve a work order to reimburse plaintiff for the cost of such equipment which was, of course, essential to the Army's operation of the facilities as warehouses. If that official had actually issued a work order approving reimbursement of the plaintiff for the cost of installing the electrical equipment, we would be inclined to hold that the plaintiff had a legal claim for such reimbursement despite the fact that the contract provided that the plaintiff would be liable for the cost of any repairs to the facilities. Branch Banking & Trust Co. v. United States, 98 F.Supp. 757, 120 Ct.Cl. 72, at pages 86 ff. In that case the court noted that a Government official authorized to make a contract for the United States has the implied authority thereafter to modify the provisions of that contract where it is clearly in the interest of the Government to do so, citing Goltra v. United States, 97 F. Supp. 618, 119 Ct.Cl. 217; 37 Op.Atty. Gen. 254; United States v. Corliss Steam-Engine Co., 91 U.S. 321, 23 L.Ed.

397 and Satterlee v. United States, 30 Ct.Cl. 31. Here, however, no such formal modification of the lease was issued and, accordingly, we cannot say that the plaintiff has established a legal claim for the amounts expended in installing the electrical equipment. We are of the opinion, however, that plaintiff has established an equitable claim for reimbursement of the $1,549.01 expended in making such installations which were of great benefit to the Government and the cost of which was recommended for payment by responsible Government officials. Accordingly, we recommend to Congress that this amount be paid to plaintiff as an equitable claim against the United States.

The Government has filed a counterclaim in the total amount of $8,724.08. Of this amount $2,127.36 represents rental for the period from October 20, 1950, to October 31, 1950, and was certified by Certificate No. US 80227, dated December 10, 1953, by the Comptroller General as due and owing the United States for unpaid rental under the lease. The balance of the counterclaim in the amount of $6,596.72 represents rental claimed by the Government to be due it on account of plaintiff's occupancy of diminishing portions of the premises for the period from November 1, 1950, to February 1, 1951, during which time the plaintiff was engaged in evacuating the facilities.

The revocation of the lease was effective November 1, 1950, and it provided that the plaintiff was obligated to pay rent up to that date. Plaintiff has paid the Government all rental due under the lease up to October 19, 1950. It concedes that it is indebted to the United States in the sum of $2,127.36 for the period from October 20 to October 31, 1950.

■ The balance of the counterclaim in the amount of $6,596.72 represents rental from the period November 1, 1950, to February 1, 1951. Under the terms of the revocation plaintiff was given 45 days within which to vacate the premises. This period was extended informally to

February 1, 1951. By February 1, 1951, plaintiff had completely moved out of the leased facilities. The District Engineer sought the advice of the Division Engineer as to whether a claim should be asserted against the plaintiff for rental from November 1, 1950, to February 1, 1951, while plaintiff was engaged in evacuating the premises. On December 14, 1951, the Division Engineer stated that he did not consider the Government entitled to payment of rent for any period subsequent to October 31 in view of the provisions contained in paragraph 20 of the plaintiff's lease and the informal extensions of time beyond the 45 days within which to evacuate granted by the commanding officer. Paragraph 20 of the lease provided that if the lease should be revoked, the lessee should vacate the premises within such times as the Secretary of the Army might designate (findings 8 and 37). In view of the instructions not to bill plaintiff for rent after October 31, 1950, the District Engineer revised the billing against the plaintiff by eliminating the claim for rent during the period from November 1, 1950, to February 1, 1951, and the only claim transmitted to the Comptroller General for unpaid rent was the claim in the amount of $2,127.36. No certificate of indebtedness has been issued with respect to the claim for rent during the period subsequent to October 31, 1950, and the defendant is not entitled to recover on this item of its counterclaim. Defendant is entitled to recover on the first item of the counterclaim if the court has jurisdiction to render judgment on the counterclaim.

■ We are of the opinion that under the circumstances of this case we do have such jurisdiction. Section 2508 of Title 28 covering this court's jurisdiction over counterclaims or set-offs, provides that upon the trial of any suit in the Court of Claims in which a counterclaim is set up by the United States against a plaintiff making claim against the United States, the court shall hear and determine such counterclaim, and if it determines that the plaintiff is indebted to the United

States, it shall render judgment to that effect. Section 1492 of Title 28, one of the sections under which H.R. 7176 was referred to this court, provides that the court shall have jurisdiction to report to either house of Congress on any bill referred to the court and to render judgment "if the claim against the United States represented by the referred bill is one over which the court has jurisdiction under *other* Acts of Congress." (Italics supplied.) Section 2509 of Title 28, the other provision of the Judicial Code under which H.R. 7176 was referred to the court, provides for a report to Congress as to whether the demand is a legal or equitable claim or a gratuity and the amount legally or equitably due from the United States to the claimant. The claims set forth in plaintiff's petition are claims for damages for breach of a contract of lease and as such are claims over which this court has jurisdiction, 28 U.S.C. § 1491. The fact that the plaintiff has not established a legal right to recover on those claims does not mean that the court lacks jurisdiction of the claims asserted in the petition. The claims are not barred by the statute of limitations or by laches, and the record indicates no facts bearing on the plaintiff's failure to resort to the established legal remedy or bringing suit in this court under 28 U.S.C. § 1491 except the obvious difficulty of establishing a right to recover in such suit.

In view of the fact that the claims represented by the referred bill are claims over which this court has jurisdiction, the court will render judgment dismissing the plaintiff's petition. 28 U.S.C. § 1492. Pursuant to 28 U.S.C. § 2509, we recommend to the Congress that there is equitably due the plaintiff the sum of $3,873.22 for the repairs it made to the warehouses and for the electrical equipment installed by it therein. The defendant is entitled to recover $2,127.36 on its counterclaim and judgment will be entered to that effect.

This opinion and the findings of fact, together with the conclusions therein, will be certified to Congress pursuant to House Resolution 406, 84th Cong., 1st Session.

It is so ordered.

McLAUGHLIN, District Judge, sitting by designation, JONES, Chief Judge, and WHITAKER, Judge, concur.

LARAMORE, Judge, took no part in the consideration and decision of this case.