**MERIDEN INDUSTRIES COMPANY**

v.

**The UNITED STATES.**

No. Cong. 5–58 *.

United States Court of Claims.

Nov. 9, 1967.

* The petition in the instant case was filed on October 20, 1958, prior to the decision of the Supreme Court in Glidden Co. v. Zdanok, 370 U.S. 530, 82 S.Ct. 1459, 8 L. Ed.2d 671 (1962). The court deems it proper to file this report at this time without reference to the Supreme Court's opinions in the latter case or to the recent Congressional Reference Act, Public Law No. 89–681, 89th Congress, 2nd Session, October 15, 1966, 80 Stat. 958, because, although filed as a Congressional Reference Case, the petition also seeks judgment under the general jurisdiction of the court and the court alone can dispose of that part of the petition and of the government's counterclaim.

John W. Kline, New Haven, Conn., attorney of record, for plaintiff.

Edward Weintraub, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

**PER CURIAM:**

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on July 28, 1967. Plaintiff has filed no exceptions to or brief on this report and the time for so filing pursuant to the Rules of the court has expired. On September 19, 1967, defendant filed a motion that the court adopt the commissioner's report to which plaintiff has failed to respond. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Plaintiff is, therefore, not entitled to recover on the petition insofar as it asserts a claim under the general jurisdiction of this court and, as such, the petition is dismissed. Defendant is entitled to recover on its counterclaim against plaintiff and judgment is entered thereon for defendant in the sum of $813.62, plus interest at 6 percent per annum from December 30, 1958. It is further concluded that plaintiff has not stated a claim either legal or equitable against the United States and this opinion and the findings, so concluding, will be reported and certified by the Clerk to Congress pursuant to House Resolution 519, 85th Congress, 2nd Session.

## OPINION OF COMMISSIONER **

GAMER, Commissioner:

A Government contractor undertook the performance of certain supply contracts. During the course of their performance, however, the contractor suspended operations and failed to complete deliveries, the contracts subsequently being terminated for default. When the contractor ceased production, it was heavily indebted on all aspects of its operations, including amounts owing to its subcontractors and suppliers, as well as to the Government itself as a result of Reconstruction Finance Corporation loans.

In this Congressional Reference case, one of its subcontractors, Meriden Industries Company (originally a Connecticut corporation), is seeking payment from the Government of the amount of the prime contractor's indebtedness for parts delivered. When operations terminated, the subcontractor's unpaid bills

** The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57 (a).

covering such parts shipments totaled $4,794.55. At that time, the subcontractor also had on hand an inventory of raw materials and work in process, and it also seeks payment from the Government of the loss it has incurred on such inventory, its claim in this respect totaling approximately $14,000.

The prime contractor was Harvey-Whipple, Inc., a Massachusetts corporation. The contracts it undertook to perform, entered into in 1952 (during the Korean war), called for the furnishing to the Army of over 1,000,000 units of a folding pick and shovel, called a "Combination Intrenching Tool." The difficulties, financial and otherwise, that Harvey-Whipple encountered in the performance of these contracts are detailed in this court's opinion and findings in Harvey-Whipple's own Congressional Reference case, in which it sought relief in the sum of over $2,100,000. In that case, the court concluded that Harvey-Whipple had no claim, legal or equitable, against the United States. Harvey-Whipple, Inc. v. United States, 342 F.2d 48, 169 Ct.Cl. 689 (1965).

Since all of Harvey-Whipple's liabilities at the time it suspended operations in 1955, including its debts to its subcontractors, were included in its claim against the Government, thus at least in part duplicating Meriden's claim, Meriden's request that the proceedings in its case be suspended pending the final determination of Harvey-Whipple's case was granted by the court. However, the ultimate conclusion by the court that Harvey-Whipple's claim had no legal or equitable merit was based upon its execution of a complete release to the Government, for which it had received valuable consideration. The events of which it complained in the proceedings before this court (i. e., the furnishing to it of defective plans and specifications) preceded the execution of, and was therefore covered by, the release. Thus, this basis for the conclusion that Harvey-Whipple's claim lacked merit not only left Meriden still uncompensated but also left undetermined the merits of Meriden's claim. Accordingly, it then became necessary to proceed with an independent adjudication of such claim.

At the time it entered into the intrenching tool contracts in May 1952, Harvey-Whipple was already in poor financial condition, and its situation progressively worsened until it suspended operations in July 1955. The company had long been in the business of manufacturing and distributing heating equipment and related articles and it was experiencing a drastic slump therein. It was greatly in need of new business. It had never before manufactured an item such as the intrenching tool.[1] In 1949 it had received an RFC loan to finance certain Government contracts and now required additional funds to finance the 1952 tool contracts. Despite a large balance due on the 1949 loan, RFC authorized in August 1952 a second loan to finance the tool contracts. All of Harvey-Whipple's physical resources were already mortgaged to RFC to secure the first loan, so the second loan was made upon the additional security (the security for the first loan also being made applicable to the second) of the moneys to become due from the Army for the tools, which moneys were assigned to the RFC.

Except for an initial advance of $56,000 to be used for capital expenditures, the arrangement between RFC and Harvey-Whipple for the disbursement of loan funds for operating purposes was that, upon a shipment of tools by Harvey-Whipple, the Army would send to RFC its check in payment of the shipment and RFC would then, upon application by Harvey-Whipple (indicating the intended uses of the funds) and approval by RFC (which included an investigation as to whether there had been any such adverse change in the borrower's financial

---

1. The court found in Harvey-Whipple's case (findings 127–128) that the record did not sustain Harvey-Whipple's contention that its financial plight when it suspended operations in 1955 was due in any substantial or measurable amount to alleged breaches of contract by the Government.

condition as would indicate an inability to repay) release a portion of the funds to Harvey-Whipple, the balance being retained for interest and principal applications on the loan. The amounts to be released to Harvey-Whipple from the Army's payments were within RFC's discretion, but as a practical matter it was recognized that these funds were the only moneys available to Harvey-Whipple with which to conduct contract operations. Harvey-Whipple had no substantial funds of its own, nor could it borrow from any other sources. Consequently, RFC released the bulk of the Army's payments to Harvey-Whipple. Up to the time production ceased in 1955, RFC received over $1,000,000 from the Army for tool shipments and of such amount disbursed over $860,000 to Harvey-Whipple, or approximately 86 percent of such receipts.

Thus, under this arrangement, Harvey-Whipple's receipt of loan funds was dependent upon its making shipments of completed tools to the Army. In the meantime, subcontractors and suppliers who shipped component parts to Harvey-Whipple would have to wait for payment therefor until Harvey-Whipple could assemble and ship them to the Army, the Army's check in payment therefor would issue to RFC, and RFC would make its disbursement therefrom to Harvey-Whipple, and provided, of course, such disbursement would be sufficient to pay all of Harvey-Whipple's outstanding operating obligations.

Meriden had previously supplied certain parts to Harvey-Whipple in connection with its commercial heating equipment business, and after Harvey-Whipple obtained the tool contracts, Meriden agreed to manufacture and supply four important components of the intrenching tool, i. e., the blade, the pick, the socket (in which a wooden handle, to be supplied by another subcontractor, was to be inserted) and the hinge (which connected the blade to the pick and the socket, and which made the "folding" possible). Harvey-Whipple subcontracted the manufacture of all the components of the tool. It itself was to do only the assembling, painting, packing and shipping of the final product. In June 1952, Harvey-Whipple placed an order with Meriden for approximately 500,000 pick, socket, hinge, and blade units, constituting half of Harvey-Whipple's total requirements. It was Harvey-Whipple's plan at that time to obtain a second source of supply for the balance. However, after it found it was unable to obtain such a second source, Harvey-Whipple, in November 1952, placed a second order with Meriden for the balance of the four parts, which order Meriden also accepted.

Meriden was a relatively small company. These orders were, for it, a large undertaking. Its plant had to be equipped for this new venture, and steel had to be purchased. However, in its attempts to obtain outside financing for these purposes, it found that, because of Harvey-Whipple's poor credit rating, the banks it approached were unwilling to lend the necessary funds merely on the strength of the prospective subcontract receipts. (The handle supplier experienced the same difficulty.) However, Meriden's president and sole stockholder, Henry H. Townshend, Jr., was a wealthy man, and bank financing for the company was finally arranged on the security of Townshend's personal guarantee. Meriden spent approximately $100,000 just to tool up for the two subcontracts. It ultimately borrowed over $200,000 to finance these subcontracts (which amount Townshend finally had to pay under his personal guarantee).

After initial delays (attributable to a steel strike and Harvey-Whipple's inability to obtain approval of preproduction samples), production on the contracts commenced in February 1953. However, during this initial period, Harvey-Whipple was not able, for various reasons, to ship any substantial number of completed tools to the Army. Although part of the difficulty was due to faulty drawings and poor specifications issued by the Army, Meriden itself was at least in good part responsible for this early unsatisfactory situation. It was experiencing difficulty with its equipment for the preheating of

the steel tubing out of which the sockets were produced. In addition, it found it had to make a new socket forging die, which, however, broke down after installation. Its pick-making die and equipment also broke down. It could thus ship few picks and sockets during this period, resulting in unbalanced shipments of the four parts and a bottleneck in Harvey-Whipple's assembly operations. Furthermore, there were generally poor inspection and quality control procedures in both Meriden's and Harvey-Whipple's plants, some of the steel used being defective. The upshot was that Harvey-Whipple could not make quantity shipments, and of the lots it was able to present for shipment, many were rejected. It fell far behind in the deliveries required by the contracts.

Few tool shipments to the Army resulted in the receipt of insubstantial funds from the RFC, and Harvey-Whipple's indebtedness to its subcontractors, including Meriden, mounted. By August 1953, Meriden's unpaid bills totaled some $32,000.

Furthermore, since Harvey-Whipple was in serious default on its Army contracts, the RFC refused to make any further loan disbursements, such default, making the contracts subject to termination, being considered an "adverse condition" seriously threatening Harvey-Whipple's financial status.

In September 1953, Meriden refused to make any further parts shipments unless its past due bills were paid and assurances were forthcoming that its future invoices would be promptly paid as they became due. Meriden was aware of the RFC action. Lacking both component parts and financing, Harvey-Whipple was compelled to cease operations and contract production thus came to a halt.

However, Harvey-Whipple made strong efforts to revive the contracts. It pressed its defective drawings and specifications claim against the Army and obtained a change order with $59,000 in increased compensation. It obtained extended delivery dates from the Army (the first of a series) thus curing temporarily at least, its default status and making itself again eligible to receive RFC financing. It settled its indebtedness to Meriden and urged it to resume production of parts, giving assurances that, with the resumption of RFC financing, it would be able to pay Meriden for parts shipped within two weeks, for, with the large-scale production it envisioned under the new, improved plans and specifications, it planned to assemble the components into completed tools and to ship them within a week of the receipt of the parts, and then to receive its RFC release of funds from the Army's payment check within another week. It was confident the fund releases it would receive from the RFC would be sufficient to defray Meriden's (as well as the other subcontractors' and suppliers') bills.

Townshend gave serious consideration to resuming production, which necessitated his making an additional capital investment in his plant because of the new dies and tooling the revised plans and specifications would necessitate. He would be willing to proceed (and thus possibly recoup his already large capital investment) if he could satisfy himself that his bills would be paid within 14 days, as Harvey-Whipple indicated. He decided, however, to check personally with the RFC concerning the details of the loan arrangements between RFC and Harvey-Whipple, and whether Harvey-Whipple's assurances of payment of his invoices within 14 days were valid.

Accordingly, on December 22, 1953, Townshend (and his attorney) went to the Boston Office of the RFC (which was handling the Harvey-Whipple account) and had a conference with the Manager, the top official of the office. It is upon this conference that much of Meriden's case is based. Although Townshend sought RFC assurances in the nature of guarantees that its bills would be paid if it resumed production, the Manager made plain that RFC's contractual relationship was only with the prime contractor, Harvey-Whipple, that no such assurances or guarantees could therefore be given by RFC to Meriden or any subcon-

tractor, and that Meriden would have to continue to look only to Harvey-Whipple for payment of its bills. He explained the nature of the Harvey-Whipple loan arrangements, including the assignment of the contract proceeds to RFC as security. The practice that had been in effect between Harvey-Whipple, the Army, and the RFC, with RFC permitting the release of the bulk of the Army's payments to Harvey-Whipple for use as operating funds, was also discussed. Similarly, suggestions by Townshend and his attorney (reflecting, obviously, the fear that the release of RFC funds to Harvey-Whipple would not necessarily lead to payment by Harvey-Whipple to Meriden) that some kind of an escrow fund from the RFC loan moneys be established and used to pay the subcontractors was negatived by the Manager as being beyond the terms of RFC's loan agreements with Harvey-Whipple and therefore outside the Manager's authority. The Manager stated that, when and if RFC financing was resumed (Harvey-Whipple again being in contract default, there having been as yet no resumption of parts shipments by Meriden and therefore, completed tool shipments by Harvey-Whipple), it would necessarily be pursuant to the same arrangements that had been previously followed and in accordance with such loan agreements. Under such arrangement, however, he felt that, if Harvey-Whipple was able to assemble and ship completed tools within a week after receipt of Meriden's component parts, it would be possible, insofar as a time schedule was concerned, for the Boston RFC Office to receive the Army's check from the Quartermaster Depot in Chicago, where the tools were shipped, and to disburse the funds therefrom to Harvey-Whipple, all within a week, so that, if Harvey-Whipple used such funds to pay Meriden, such payment could be made within the 14-day period Harvey-Whipple had proposed.

After this conference, Townshend decided to resume his subcontract production on the basis of Harvey-Whipple's 14-day credit plan and, after Harvey-Whipple was again able to work out an arrangement with the Army for a new and less onerous delivery schedule (upon the consideration of a small reduction in the contract price of the tools), thus taking it out of default and again making it eligible for RFC financing, Meriden commenced making new shipments of components in February 1954. These shipments were, of course, followed by shipments of completed tools by Harvey-Whipple to the Army.

However, up to the time all production ceased almost a year and a half later, Harvey-Whipple continued to be plagued by financial and production difficulties, and, despite the resumption of RFC financing on the basis described, had constant difficulty in paying its subcontractors and suppliers. It was losing large sums on its overall operations, with its financial condition constantly worsening. Its heating equipment business continued in a serious slump. In 1952, the year it took on the tool contracts (but before any large-scale production commenced thereunder) it lost $147,000, and in 1953, it suffered another loss of over $220,000. At that time, it became insolvent. Its losses continued in 1954, its loss for the year totaling $180,000. Although, as stated, RFC financing was reestablished in February 1954, by April 1954, it again fell behind in the payments of its bills, and in that month, by a general notice issued by Harvey-Whipple, a creditors' meeting was called, a condition which was again considered an adverse change by the RFC, resulting in its again suspending the advancing of further loan funds. In addition, Meriden again suspended further shipments of components, its unpaid bills again mounting, and once more Harvey-Whipple fell into default in its contract deliveries.

But again Harvey-Whipple struggled to salvage the situation. After production had resumed in February 1954, an unexpected production difficulty arose. Meriden's hot-forming method of producing sockets was proving unsatisfactory, resulting in a high rate of rejections, and seriously affecting Harvey-Whipple's ability to ship completed parts.

A change in the socket production method became necessary, which would take two months to complete and during which production under the contract would have to be suspended. It became obvious that the contract rate of production, even as amended, could not be attained by Harvey-Whipple with Meriden' as the sole source of its supply for the important components it was manufacturing. Again a search (unsuccessful) for a second source was instituted. In the meantime, Harvey-Whipple once more beseeched the Army for a delivery schedule extension, and was able to persuade the RFC to make some straight loan advances, although it was not making any tool shipments, so that it could pay some of its creditors and overhead expenses and thus stay alive pending Meriden's socket-method changeover, when (assuming the Army would permit the contracts to stand) production could resume. And indeed, although, in August 1954, the Army did partially terminate for default some of the contract amounts, it allowed a large balance to stand and, as to such balance, again readjusted the delivery schedule to make compliance easier. Thus production and shipments once more resumed.

But still Harvey-Whipple was not able to meet its adjusted contract delivery requirements. Nevertheless for several months the Army, despite the contractor's default, allowed it to ship whatever tools it could, and the RFC (pursuant to special authorizations by its Administrator) continued to release funds from the Army's payments. However, January 15, 1955 was the final contract delivery date, and the contractor's delinquency on such date had risen to over 400,000 tools. In February 1955, the Army finally gave formal notice of its intent to terminate the contracts for default, but once again Harvey-Whipple strongly urged that it be permitted to continue. As inducement and consideration. it offered another price reduction and the withdrawal of its

pending appeal with respect to the already effected partial termination. This proposal was accepted, and, in March 1955, with the execution of appropriate documents (a release by Harvey-Whipple and a supplemental agreement) a new and extended delivery schedule for the remaining tools was again worked out.

However, despite the continued release of RFC funds [2] to Harvey-Whipple against Army payments for tool shipments on the same basis as previously, Harvey-Whipple was not able to meet its obligations to certain of its suppliers and subcontractors (including its handle supplier and heat treater) although as of July 1, 1955, it was current with respect to Meriden's bills. Around July 1, the unpaid suppliers and subcontractors, including the heat treater, whose unpaid bills went back to March, began to press vigorously for payment. Harvey-Whipple, attributing its plight to the RFC releases of Army funds being insufficient to defray its obligations, admitted its inability to liquidate its obligations to the complaining subcontractors. During this time, Meriden made several additional shipments of parts, but on July 12, 1955, Harvey-Whipple advised it would not be able to pay the $4,794.55 balance due to Meriden resulting from such shipments, again attributing its condition to the insufficiency of the funds it was receiving from RFC.

Meriden and the other subcontractors took Harvey-Whipple's statements to mean that the RFC, contrary to its past practice, had decided not to release any further funds to Harvey-Whipple, or that it had reduced such releases. Whether or not such belief was justified on the basis of what Harvey-Whipple told them, the true facts were that there had been no change in RFC's policy or practice concerning such fund releases. In June, RFC had received $58,709.30 from the Army, and released to Harvey-Whipple $50,798.53. On July 11, Harvey-Whipple made two tool shipments, and of the $34,-

2. By that time the Defense Lending Division of the Treasury Department had succeeded the RFC. However, the agency will be referred to herein throughout as the RFC.

003.46 paid therefor by the Army, RFC released to the contractor $25,267.08, but neither Meriden nor, apparently, the other subcontractors received any part thereof. The record does not indicate what Harvey-Whipple did with these funds.

In any event, after Harvey-Whipple's July 12, 1955 statement to Meriden of its inability to pay its then outstanding invoices, Meriden suspended further contract operations and formally so advised Harvey-Whipple by letter of July 15. This in turn effectively crippled Harvey-Whipple's further performance of the contracts.

Meanwhile, the subcontractors began complaining to the RFC about their unpaid bills and RFC's alleged withholding of funds causing such condition, but RFC denied that their plight was due to any such circumstance, and demanded an explanation from Harvey-Whipple as to the erroneous information it was seemingly giving the subcontractors. Harvey-Whipple assured RFC the subcontractors had misunderstood, and, as it promised RFC it would do, wrote to Tatem Manufacturing Company, the handle supplier (and presumably to the other subcontractors) that RFC's fund releases were "in strict accordance" with agreed procedures but that its financial plight was due to cost increases (for one thing, Meriden had, in 1954, increased the price of its components), and that "stoppage of two vital components prevented a shipment which was scheduled for July 15, and this precipitated the current strained situation."

In the meantime, four subcontractors, including Meriden, conferred with the Chicago Quartermaster Depot and advised they would make no further shipments or do any further work on their subcontracts unless their past due bills were paid. The Army, considering the problem a financial one (at that time, Harvey-Whipple was not, under the amended schedule, in default on contract deliveries) referred them to RFC. The subcontractors then inquired of RFC whether, if they resumed work, RFC would give them assurances their bills would be paid, but RFC replied that it could give no such assurances and that the subcontractors and suppliers would have to continue to look to Harvey-Whipple alone for payment.

Harvey-Whipple was, meanwhile, still desperately attempting to stave off the impending disaster. It had made no tool shipments since the aforementioned July 11 ones, had therefore received no RFC funds since then, and was in default on its RFC loans. Although the subcontractors had ceased production, it had on hand from prior subcontractor shipments enough components to assemble 10,000 tools. On July 26, 1955, its representatives conferred with RFC officials in Washington and stated that a shipment by it of such 10,000 tools would generate $19,430.55 in Army funds, and that RFC could clear the default by retaining $5,200. Furthermore, the release of the $14,230.55 balance to Harvey-Whipple would enable it to make at least some payments to its subcontractors and possibly induce them to resume production, which appeared to be Harvey-Whipple's last hope of salvaging the situation. The RFC officials agreed to go along with this effort to continue the life of the contracts.

However, later that same day, three subcontractors, including Townshend of Meriden (who apparently were not aware of Harvey-Whipple's prior meeting with RFC or its plan to make a 10,000 tool shipment) conferred with RFC in Washington and categorically stated, as they had previously advised the Chicago Quartermaster Depot, that they had decided to make no further shipments of component parts, and to perform no further services (such as heat treating) unless their past due indebtednesses were paid in full and satisfactory arrangements, in the nature of RFC guarantees, made for the payment of their future invoices. This would mean that RFC would now, and very probably in the future, have to make further straight loan advances to Harvey-Whipple over and above those released, as in the past, from Army payments, for

the total of their current indebtednesses exceeded the proposed $14,230.55 release from the forthcoming 10,000 tool shipment, and, as shown, in the past such releases against shipments had not proved to be sufficient to defray Harvey-Whipple's indebtednesses to them. Since this would practically amount to a guarantee by RFC of the payment of their current and future bills, the RFC officials refused and stated that the only funds RFC would continue to make available to Harvey-Whipple would, as in the past, be a portion of the Army receipts after deducting appropriate amounts for application to the RFC loans. This was not satisfactory to the subcontractors, since such system had not resulted in the prompt payment of their invoices. They accordingly advised the RFC officials that their contract performance was definitely ended. It was thus plain that, in turn, there was no hope for the completion of the contracts by Harvey-Whipple.

By letter of July 29, 1955 to the Quartermaster, Meriden confirmed that, in view of the position taken by the RFC that it "would not make available additional financing for the prime contractor, except on an invoice discounting basis" and that "the prime contractor has stated it has no other source of financing immediately available" and was "unable to pay past due invoices and cannot meet payment of invoices on our credit terms", it was suspending further shipments of component parts. (By letters of August 1, 2, and 3, to Harvey-Whipple and the Army three other subcontractors also confirmed their decisions not to resume contract performance unless their accounts were paid in full.)

Since it was now clear that the arrangements made at the July 26 conference with the Harvey-Whipple officials for the 10,000 tool shipment and the release of some $14,000, all for the possible purpose of revival and completion of contract performance, were now frustrated and could not materialize, RFC, on July 29, 1955, wired Harvey-Whipple that, in view of the subcontractors' advice to both the Quartermaster and the RFC concerning their refusal to make further deliveries of components, the RFC would not follow through with such arrangements. The record does not indicate whether Harvey-Whipple received this telegram prior to its shipment of the 10,000 tools to the Army. In any event, it did make such shipment, but RFC refused to make any fund releases to it from the Army's $19,430.55 payment check, which RFC received on August 2, 1955. Instead, it applied the full proceeds thereof to Harvey-Whipple's RFC loans.[3] There was, thereafter, no further contract performance by the subcontractors or Harvey-Whipple. There is still due to Meriden from Harvey-Whipple said sum of $4,794.55 for its unpaid invoices, and, when further performance ended in July 1955, Meriden had an inventory which was usable for contract performance upon which it has suffered a net loss of $12,641.04.

Meriden says that the statements made by the Manager of the Boston Office of the RFC during his conference with Townshend in December 1953, constituted a representation that the major portion of the Army payments would always be released by RFC for the benefit of Harvey-Whipple's subcontractors and suppliers, and that this induced Meriden, after its long suspension, to resume production, resulting in the losses now claimed. It argues that its acting in reliance on this oral promise constituted a contract implied in fact, and that RFC's appropriation of the full amount of the Army's final check was a breach of such contract for which this court may award damages under its general jurisdiction. It further urges that even if no such legal cause of action can be spelled out, it is, on broad equitable or moral bases applicable to Congressional Reference cases (Burkhardt v. United States, 84 F.Supp. 553, 113 Ct.Cl. 658 (1949)), deserving of re-

3. After subsequently applying amounts collected as a result of foreclosure proceedings, there was still due the RFC $156,578.03 on account of its loans to Harvey-Whipple.

lief since it was Meriden's performance of its subcontract which, in the form of completed tools, inured to the Government's benefit. It contends that it was RFC's action in retaining for its own benefit the entire proceeds of the final Army payment which prevented Harvey-Whipple from completing its tool contracts, with the resultant payment to it (and the other subcontractors) of the amounts owed them, as well as the profitable consumption of its unused inventory.

None of these contentions are valid.

■ First, no contract of any kind resulted from Townshend's conference with the Manager in December 1953. As shown, the Manager made plain at that time that RFC was in no contractual relationship with Meriden or any subcontractor, and therefore rejected all attempts to obtain direct payment guarantees by RFC or to establish RFC fund escrow arrangements. He emphasized that Meriden would have to continue to look solely to Harvey-Whipple for payment. Not only does Townshend admit in his testimony that he thoroughly understood this, but his actions throughout the life of the project confirmed such understanding. As noted, whenever Harvey-Whipple fell behind in its payments to Meriden, Meriden pressed Harvey-Whipple, or suspended shipments entirely. It never made claim against the RFC. Even toward the end in July 1955, when the subcontractors, acting in concert, attempted to obtain direct RFC assurances of payment if they would resume production, RFC again refused, making plain once more that its agreement was only with Harvey-Whipple and that the subcontractors would have to continue to look solely to Harvey-Whipple for the payment of their bills.

■ Nor was there anything in the nature of a promise that RFC would, under any and all circumstances, always and automatically make partial releases of Army tool payment funds to Harvey-Whipple. The Manager fully explained to Townshend and his attorney, and they well understood, the nature of the Harvey-Whipple—Army—RFC financial arrangements, and the governing Harvey-Whipple—RFC loan agreements. Meriden understood that the Army funds would, pursuant to Harvey-Whipple's assignment, be sent to and held by RFC (in a "cash collateral" bank account), that Harvey-Whipple would have to request the release of such funds, and that such request would have to be backed up by a showing of eligibility (i. e., it was not in default on its Army contracts and that repayment of the loan funds requested to be released was, in RFC's opinion, reasonably possible.) Indeed, Meriden had already seen in August 1953 that, when Harvey-Whipple fell into default on the contracts, RFC would not, because of such "adverse condition", make further disbursements to Harvey-Whipple. Obviously, although RFC, unlike the normal commercial lender, could take greater risks, yet it also had the ordinary lender's interest in making certain that there was a reasonable prospect that the borrower could repay the loan. Thus, RFC's refusal to advance to Harvey-Whipple any part of the Army's last check breached no understanding, promise, or "implied in fact" contract between RFC and Meriden.

■ Nor, at the December 1953 stage of the project, was there any such strong favorable feeling by RFC toward Meriden which would impel it to make special promises or arrangements in its favor so as to "induce" Meriden's continued participation, with such "inducement" constituting the basis for a contract "implied in fact".

While it was recognized, of course, that Harvey-Whipple was wholly dependent on subcontractors, and that RFC could not hope to obtain repayment of the loans already made unless Harvey-Whipple was kept alive and was able to complete its contracts, nevertheless Meriden's own performance up to then had been far from satisfactory. Indeed, much of Harvey-Whipple's poor performance during this period was attributable to Meriden. Its equipment breakdowns and other contributions to contract delays are detailed above. The Army was urging Harvey-

Whipple to obtain another source of supply for the components Meriden was manufacturing. There is thus little basis for concluding that there was then any special reason for RFC's "inducing" Meriden's continued performance. Throughout the project both the Army and the RFC emphasized the need for another source, for it became obvious that, with Meriden as the principal subcontractor, Harvey-Whipple would always have extreme difficulty in meeting its contract obligations. However, although Harvey-Whipple kept giving assurances that such a second source of supply would be acquired, it never succeeded in obtaining one. Indeed, after contract production resumed in February 1954 following the long 1953 suspension, Meriden again ran into socket production trouble and had to change its entire manufacturing method (from the hot to the cold rolling process), causing a two-month cessation in the entire tool production program, and resulting in another intensive (but again unsuccessful) search for a second subcontractor source of supply. Meriden's performance hardly generates a strong case based on general equitable considerations.

■■■■ Nor does the record support Meriden's contention that RFC's decision not to honor Harvey-Whipple's request that funds be released from the Army's $19,430.55 payment for the July 29, 1955, 10,000 tool shipment was a contract termination device reflecting the fact that the Army no longer needed the tools and, with no regard for Harvey-Whipple's or the subcontractors' welfare, was therefore no longer interested in contract performance. On the other hand, the proof makes plain that further contract performance was made impossible not by the Army or the RFC but by the subcontractors themselves, and particularly Meriden. It was Townshend who, after being advised by Harvey-Whipple on July 12, 1955, of its inability to pay Meriden's then outstanding indebtedness, made the decision, set forth in its firm letter of July 15, 1955, and thereafter stubbornly adhered to, that it was through with

Harvey-Whipple and further contract performance unless past debts were promptly cleared up and there were more certain assurances of future payments, conditions which could not then be met. No criticism of Meriden for adopting this attitude can fairly be made. This was an understandable business decision on its part. But this, together with the identical attitude thereafter adopted by the other subcontractors acting in concert with Meriden (seemingly in an attempt to force RFC's hand and cause it to pay their debts, the repayment of Harvey-Whipple's large indebtedness to RFC also being dependent upon continued contract performance by Harvey-Whipple), is, nevertheless, what finally terminated Harvey-Whipple's performance. It was only after these ultimata, issued by the subcontractors to both the Army and the RFC, that RFC reasonably concluded to cease making further loan advances. Since the purpose of the loans was to finance contract performance, and since such performance was, by the subcontractors' action clearly over, further loans to Harvey-Whipple would obviously serve no useful purpose.

Indeed, the record shows a liberal and considerate attitude by both the Army and RFC throughout the project in keeping Harvey-Whipple and contract performance alive. Harvey-Whipple was constantly in default both on its contract deliveries and its RFC payments, but time and again the Army modified and extended the delivery schedule and RFC the loan maturity dates. Financing continued even though, as of December 31, 1953, Harvey-Whipple was insolvent. For long periods the Army waived huge contract defaults and permitted Harvey-Whipple to continue to make whatever shipments it could, and RFC tolerantly made further loan advances despite such contract default status, at one time even making straight loan advances without the security of contract shipments in an attempt to get Harvey-Whipple back on its feet by providing some funds with which to stave off its creditors. Had the Army or RFC wanted to effect a termination of the contracts because the

tools were no longer needed or for other reasons, there were plenty of opportunities to have done so. The charge of inconsiderate treatment of Harvey-Whipple and the subcontractors by the Army and the RFC on this project is not supported by the record.

Finally, although it is difficult to see how Meriden has any standing to complain about RFC's failure to make a certain loan advance pursuant to a loan agreement to which Meriden was not even a party and with respect to a tool shipment it did not even know would be made, nevertheless even if it be assumed that there was some direct obligation, legal or otherwise, running from RFC to Meriden to make the $14,230.55 advance to Harvey-Whipple with respect to the last tool shipment, there is no showing that Meriden would have received any benefit from it anyway, or if so, how much. The fact that RFC provided Harvey-Whipple with funds did not mean that Harvey-Whipple would necessarily pay over any part thereof to Meriden. Despite the impression Harvey-Whipple was apparently giving its subcontractors in July 1955 that its financial plight was due to RFC and its failure to provide sufficient financing, the fact was that RFC had in that and the previous month continued to provide Harvey-Whipple with the same type of financing against shipments that it had provided in the past. As above noted, in June 1955, RFC received approximately $59,000 from the Army and released approximately $51,000 to Harvey-Whipple, and on July 13, 1955, released another $25,200 from some $34,000 received. Thus, Harvey-Whipple received over $25,000 from RFC in July at the very time it was complaining to the subcontractors that it was not receiving RFC funds. As stated, what Harvey-Whipple did with those funds the record does not show. Suffice it to say that neither Meriden nor the other subcontractors received any of them, nor is there any more reason to believe that Meriden would have received any part of the $14,230.55 which it now

contends RFC was obligated to release to Harvey-Whipple, or if so, how much. Actually, this problem existed throughout the entire project. Despite RFC financing, Harvey-Whipple was constantly under financial strain. There simply was not enough income to defray all of its debts. This may have been due to the possible unprofitableness of the Army contracts (at the very beginning the Army officials questioned the bid price, which they considered quite low), or to the huge losses it was suffering on its regular heating business, or to other reasons. The fact is that RFC financing of these particular contracts did not automatically result in payment to the subcontractors of their bills, of which Meriden was more than once well aware.

Meriden's inventory claim is on even less sound footing, for some inventory on hand in July 1955 (the record does not show how much) was purchased at the very beginning of the project, and prior to any of the events of which Meriden here complains. Certainly when Meriden first decided to embark on this venture, RFC played no part in its decision. At that time Meriden must have known that it was assuming a real risk, for even then Harvey-Whipple was already in poor financial condition, a fact which, if it did not know from its past dealings with Harvey-Whipple, was forcibly brought to its attention when it attempted to obtain bank financing for the subcontracts here involved.

■■ The approximately $17,000 unpaid invoice and inventory loss for which Meriden here seeks recovery is only a small part of its total loss of around $300,000 on this project. Of course, one naturally sympathizes with its plight. However, it went into this venture as a subcontractor with full knowledge of the business risks involved and of the fact that its fate depended primarily on Harvey-Whipple's ability to complete the contracts successfully. There is no justification, legal or equitable, for its attempt here to shift any part of its losses to the

Government with which it had no contractual relationship at all.[4]

### DEFENDANT'S COUNTERCLAIM

Meriden is indebted to the Government in the sum of $813.62, the indebtedness arising out of two supply contracts between Meriden and the Department of the Army entered into on March 6, 1950 and May 26, 1950, respectively. There is no dispute between the parties as to this indebtedness and they have stipulated that judgment may be entered against Meriden for such amount, plus interest.

Even though the petition is filed pursuant to a Congressional Reference, judgment may be granted on a Government counterclaim where the claim set forth in the petition is one over which the court otherwise has jurisdiction, such as one for breach of contract. Maco Warehouse Company, California v. United States, 169 F.Supp. 494, 144 Ct.Cl. 538 (1959). Here the court could, under its general jurisdiction, consider Meriden's claim that a contract implied in fact existed between it and the Government and that RFC's action constituted a breach thereof. See Padbloc Co., Inc. v. United States, 161 Ct.Cl. 369 (1963); Grace Line, Inc. v. United States, 155 Ct.Cl. 482 (1961).

Accordingly, judgment should be entered against Meriden Industries Company in the sum of $813.62, plus interest at six percent from December 30, 1958, the date of the filing of the counterclaim herein.

---

4. Meriden's existence as a Connecticut corporation was terminated in 1953. Thereafter, the business was conducted by Toy Metal Mfg. Company, another Connecticut corporation whose stock was also wholly owned by Townshend. However, Toy Metal continued to carry on under Meriden's name, duly executing and filing the required Trade Name Certificate certifying that it was conducting business under the trade name of Meriden Industries Company. The relief bill introduced in the House of Representatives was for the benefit of Meriden. However, on October 31, 1957, prior to the time the House of Representatives, by Resolution, referred the relief bill to this court for a report, Toy Metal too was dissolved.

The petition filed herein on October 20, 1958, on behalf of Meriden recites that "The plaintiff is a corporation organized under the laws of the State of Connecticut and at the time of the filing of this petition and all times mentioned herein maintained and maintains its principal office in the Town of Hamden, County of New Haven and State of Connecticut."

The Government says that the claim herein should not even be considered on the merits because the allegations in the petition (and the similar statements made to the Congress) are false, that there no longer is a "Meriden" entity, that even its successor corporation, Toy Metal, no longer exists, and that there is no proper claimant at all before Congress or this court.

However, while the allegations of the petition are not technically correct, nevertheless, in view of Toy Metal's carrying on of the business in Meriden's trade name, the lawfulness of which defendant does not challenge, and the fact that the laws of the State of Connecticut both at the time the petition was filed (Conn. Gen.Stat., § 33–7) and now (§ 33–378(e)) permit dissolved corporations to continue their existence for the purpose of collecting any assets to which they may be entitled, defendant's contention lacks merit. In fact, the claim is for the benefit of Townshend, who was the sole stockholder of both Meriden and Toy Metal.